## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

ANASTASIA SENEGAL            CIVIL ACTION NO. 20-0371

VERSUS                      JUDGE JUNEAU

U.S. COMM'R S.S.A.          MAGISTRATE JUDGE WHITEHURST

### REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be REMANDED for consideration of new evidence, as set forth below.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Anastasia Senegal, filed the instant appeal *pro se*, seeking judicial review of the January 25, 2019 decision of the ALJ that she was no longer disabled as of September 30, 2016. Senegal was initially approved for disability benefits beginning on November 1, 2011, based upon bipolar disorder, Crohn's disease, fibromyalgia, hypertension, migraine headaches, chronic pain syndrome, and depression, all of which were found to medically equal Listing 12.04 of the listed Impairments. A continuing disability review ("CDR") was thereafter conducted, at which time it was determined that the claimant's condition had improved; benefits were ceased effective September 30, 2016. This finding was upheld by a disability

1

hearing officer, and the claimant requested a hearing before an ALJ, which was conducted on June 21, 2018. The claimant appeared at the hearing without an attorney, after waiving her right to representation.

After the hearing, the Agency accepted additional evidence. After reviewing that evidence, the ALJ concluded the claimant was no longer disabled as of September 30, 2016.[1] The ALJ issued an unfavorable decision on January 25, 2019.[2] A timely appeal was taken from the ALJ's decision and the Appeals Council denied the claimant's request for review on January 16, 2020, making the ALJ's January 25, 2019 decision a final decision for the purpose of the Court's review pursuant to 42 U.S.C. §405(g). The claimant then filed this action seeking review of the Commissioner's decision.

### SUMMARY OF PERTINENT FACTS

The claimant was born in 1971. The most recent favorable medical decision finding plaintiff was disabled [the "Comparison Point Decision"] is the decision dated November 1, 2001. The claimant was 45 on September 30, 2016, the date on which the ALJ determined she was no longer disabled, and is considered a "younger individual" under the Social Security guidelines. She has at least a high school education and no past relevant work.

---

[1] Tr. 281-91.
[2] Tr. 279-91.

Two months after the ALJ issued her unfavorable decision, the claimant submitted new evidence to the Appeals Council, which determined that the new evidence would not change the outcome of the ALJ's decision. The claimant challenges this finding of the Appeals Council, and further argues that there is not substantial evidence in the record to support the ALJ's residual functional capacity assessment.

## ANALYSIS

### A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[3] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[5]

---

[3] *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[4] *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[5] *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[6]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[7] Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[8]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[9]

## B.    Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[10]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and

---

[6] 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[7] *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[8] *Martinez v. Chater*, 64 F.3d at 174.

[9] *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[10] See 42 U.S.C. § 423(a).

is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[11]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[12]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[13]

## C.    **Evaluation Process and Burden of Proof**

The Social Security Administration may terminate benefits if the agency concludes, after reviewing a claimant's case, that the claimant's impairment "has ceased, does not exist, or is not disabling...."  42 U.S.C.A. § 423(f).  In a typical social security case, where the issue is whether a claimant is disabled and should

---

[11] 42 U.S.C. § 1382(a)(1) & (2).
[12] 42 U.S.C. § 1382c(a)(3)(A).
[13] 42 U.S.C. § 1382c(a)(3)(B).

therefore be granted Social Security benefits in the first place, the Commissioner (through an ALJ) applies a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). In cases such as this, however, where the Commissioner is deciding whether to terminate existing benefits due to an alleged medical improvement, 20 C.F.R. § 404.1594(f) prescribes an eight-step evaluation process to determine:

(1) whether claimant is engaging in substantial gainful activity;

(2) if not gainfully employed, whether the claimant has an impairment or combination of impairments which meets or equals a listing;

(3) if impairments do not meet a listing, whether there has been medical improvement;

(4) if there has been medical improvement, whether the improvement is related to the claimant's ability to do work;

(5) if there is improvement related to claimant's ability to do work, whether an exception to medical improvement applies;

(6) if medical improvement is related to the claimant's ability to do work or if one of the first groups of exceptions to medical improvement applies, whether the claimant has a severe impairment;

(7) if the claimant has a severe impairment, whether the claimant can perform past relevant work; and

(8) if the claimant cannot perform past relevant work, whether the claimant can perform other work.

*Spearman v. Comm'r of Soc. Sec.*, 84 F. Supp. 3d 531, 534–35 (N.D. Miss. 2015).

The claimant is appearing *pro se*, and the undersigned notes that many of her arguments are overlapping and/or appear only in headings in the brief. The undersigned has done her best to address every perceived error urged by the claimant.

## D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ applied the eight-step analysis and made several findings as part of that analysis, including the following:

- The "comparison point decision" ("CPD") is November 1, 2001, which is the most recent favorable medical decision finding that the claimant was disabled.

- At the time of the CPD, the claimant had the following medical determinable impairments: bipolar disorder, Chrohn's disease, fibromyalgia, hypertension, migraine headaches, chronic pain syndrome, and depression. These impairments were found to medically equal Listing 12.04 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFP 404.1520(d)).

- Through the date of the ALJ's decision, the claimant had not engaged in substantial gainful activity.

- The medical evidence establishes that, since September 30, 2016, the claimant has had the following severe medically determinable impairments: arthropathy of shoulder; disorder of vestibular function; history of concussion; seizure disorder; neuropathy at wrist; cervical degenerative disc disease; osteoarthritis; fibromyalgia; cervical, thoracis, and lumbar spondylosis; migraine headaches; posttraumatic stress disorder; general anxiety disorder; major depressive disorder; bipolar disorder; hypertension; mild ulnar neuropathy at elbow; diabetes mellitus; Chrohn's disease; obesity; hyperlipidemia; asthma; and vitamin D deficiency.

- Since September 30, 2016, the claimant has not had an impairment or combination of impairments which met or medically equals the severity of a listed impairment.

- Medical improvement occurred on September 30, 2016.

- Since September 30, 2016, the claimant has continued to have a severe impairment or combination of impairments.

- Based on the impairments present since September 30, 2016, the claimant has had the residual functional capacity to perform light work with unskilled work activity, defined as simple, routine tasks involving no more than simple, short instructions, and simple work-related decisions with few workplace changes; she should avoid all exposure to concentrated fumes, odors, dusts, gases, and any type of pulmonary or respiratory irritants; she should never climb ladders, ropes, or scaffolds; no driving; she should avoid all exposure to workplace hazards such as dangerous moving machinery and unprotected heights; she is limited to no more than occasional overhead reaching with the upper right, dominant extremity; and she is limited to unskilled work activity and also no more than occasional interactions with coworkers and the general public.

- The claimant has no past relevant work.

- On September 30, 2016, the claimant was a younger individual age 18-49.

- The claimant has at least a high school education and is able to communicate in English.

- Transferability of job skills is not an issue because the claimant does not have past relevant work.

- Since September 30, 2016, and based on the impairments present since September 30, 2016, the claimant has the residual functional capacity to perform a significant number of jobs in the national economy.

- The claimant's disability ended on September 30, 2016, and the claimant has not become disabled against since that date.

## E.    THE ALLEGATIONS OF ERROR

The claimant alleges that the following errors occurred:

- The ALJ did not properly develop the record;

- Remand is required because the Appeals Council did not properly consider the new evidence she submitted;

- the ALJ erred at Step 2;

- the ALJ gave improper weight to the statement of Dr. Edgardo Concepcion, her treating physician;

- the ALJ did not properly consider the alleged side effects of the claimant's medications;

- the claimant was prejudiced at Step 5 regarding the questioning of the vocational expert ("VE") at her administrative hearing.

The undersigned will address each of the claimant's assignments of error in turn.

### Development of the record

The claimant argues that the ALJ failed to develop the record, apparently because all of her medical records were not received by the agency. An ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996), *citing Kane v. Heckler,* 731 F.2d 1216, 1219 (5th Cir.1984). When

a claimant is not represented by counsel, the ALJ owes a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id.* at 1219–20 (citations and internal quotation marks omitted). A decision of the ALJ will be reversed as not supported by substantial evidence if the claimant shows (1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby. *Id.* at 1220.

As an initial matter, the undersigned notes that the claimant waived her right to counsel at her June 21, 2018 administrative hearing.[14] At the hearing, the ALJ asked the claimant to notify her of all medical providers she had recently seen so that the Agency could request updated records from those individuals.[15] After noting that claimant's record then only contained documents up to Exhibit 23F,[16] the ALJ updated the record with additional records that the Agency requested from providers on June 27, 2018.[17] Thus, the record shows that the ALJ properly requested all medical records the claimant notified her about. It is well-settled that the ALJ was under no duty to seek out evidence that the claimant did not identify. *See Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (although the ALJ has a duty to develop the record fully and fairly, the claimant has the duty to obtain medical records and

---

[14] Tr. 302-03.
[15] Tr. 302-307.
[16] Tr. 308-09.
[17] Tr. 918-1225.

documentation showing that she is disabled); *see also Thorton v. Schweiker*, 663 F.2d 1312, 1316 (5th Cir. 1981) ("We, of course, do not hold that the Social Security Administration is responsible for securing evidence of disability for a claimant. That duty is clearly on the claimant"). To the extent that the claimant is arguing that, even though the ALJ requested additional records after the administrative hearing, the ALJ failed to collect *all* records in existence at the time she issued her decision, such claim is without merit. In *Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015), the Fifth Circuit rejected the argument that an ALJ has a duty to obtain all of a plaintiff's medical records before reaching a decision and reaffirmed that the ALJ's duty is "one of developing all relevant facts, not collecting all existing records." *Id*.

The record shows that the ALJ allowed the claimant to submit additional medical evidence after the administrative hearing. The Agency requested records from providers identified by the claimant. Considering the foregoing, the undersigned concludes that the argument that the ALJ failed to develop the record is not persuasive.

### New evidence submitted to the Appeals Council and opinions of treating physicians

In a related argument, the claimant argues that the ALJ did not gather additional documents that she herself later provided to the Appeals Council. The

record shows that the Appeals Council received a significant number of documents[18] along with the claimant's request for review, but determined that the new evidence did not show a reasonable probability that the evidence would change the outcome of the ALJ's decision.  The claimant argues the new evidence includes a March 18, 2019 Mental Residual Functional Capacity Assessment[19] from Dr. Ulrich, which shows that she has near total limitation of mental health functioning.

In *Higginbotham v. Barnhart*, 405 F.3d 332, 337–38 (5th Cir. 2005), the Fifth Circuit held that a final decision of the Commissioner of Social Security includes the Appeals Council's denial of a request for review.  The court went on to find that evidence submitted for the first time to the Appeals Council is part of the record on appeal because the regulatory statute itself provides that such record includes the "evidence upon which the findings and decision complained of are based." *Higginbotham*, 405 FD.3d at 337, *citing* 42 U.S.C. §405(g).  Because the Appeals Council considers and evaluates such evidence, that evidence constitutes "evidence upon which the decision complained of is based." *Id.*  In *Higginbotham*, the court held that the district court should have considered and addressed the new evidence that Higginbotham submitted to the Appeals Council; because it didn't, the judgment of the district court was vacated, and the case was remanded for further

---

[18] These documents are located at Tr. 7-275 in the record.
[19] Tr. 194-97.

consideration.  *Id.*  Considering the foregoing, this Court will consider the Mental Residual Functional Capacity Assessment that Dr. Uhrich completed in determining whether there is substantial evidence to support the ALJ's decision.

The Commissioner argues that Dr. Uhrich's March 2019 Assessment was written nearly two months after the ALJ issued her decision and does not clearly indicate the time period to which it applies.[20]  Furthermore, the Commissioner argues that the Assessment – that the claimant has near-total limitation – is inconsistent with Dr. Uhrich's most recent treatment records, which show that the claimant was not totally limited as Dr. Uhrich opined in the March 2019 Assessment.  In support of this argument, the Commissioner points to an October 2018 Progress Note from Dr. Uhrich, wherein the claimant reported that she was feeling "better,"[21] and a December 2018 treatment note where the claimant reported that she was feeling "about the same."[22]  The ALJ also pointed out that the claimant repeatedly failed to take her medication as instructed, and while having some mental limitations, often exhibited normal findings on examination.[23]

After a review of the record, the Commissioner's interpretations of Dr. Uhrich's treatment notes are not consistent with this Court's interpretation of the

---

[20] Tr. 194-7.
[21] Tr. 182.
[22] Tr. 178.
[23] Tr. 287-288, 606, 612, 618-619, 622, 669, 797, 811-812, 815, 957, 1026, 1037 ("simply noncompliant" with medication).

treatment notes.  In the treatment notes dated October 13, 2018, while the claimant did indicated that she was "feeling better," the rest of the report goes on to catalog a list of the symptoms the claimant was experiencing, including inability to sleep; extreme anxiety; episodes of tachycardia, rapid breathing, and sweating; chest pain; sensations of choking; feelings of confusion; sensations of derealization; more frequent occurrences of dizziness; frequent and intense feeling of losing control; feelings of burning, pricking and tingling of the skin; increased motor restlessness associated with anxiety ; increased symptoms of PTSD; feelings of detachment; and a restricted range of affect.[24]  Similarly, in December 12, 2018, Dr. Uhrich reported that the claimant's symptoms were essentially unchanged, and that her mental health issues had either remained the same or were intensified.

On February 1, 2018, Dr. Uhrich reported the following history from the claimant:

> It hasn't been good.  Tells me that her sleep has been terrible.  Tells me that her days and nights have been mixed up.  She has been sleeping 3-4 hours a night.  Falls asleep at daybreak or in the afternoon.  Has noticed changes in her behavior, meaning her gambling has gotten worse, her sleep has gotten worse.  She has made over 200 Christmas balls and has changed them into Mardi Gras balls.  She was also trying not to make too many changes in her medications because she was always having side effects.  She lost $5,000.00 in one week.  Patient had a brain [sic] in May 2017 in which she hit her head on the concrete step and then was falsely arrested at the end of August 2017 and the

---

[24] Tr. 182.

police banged her head into ground and sustained a concussion and gustatory, auditory, visual hallucinations, déjà vu and jamais vu.[25]

These notes indicate that the claimant was taking the following medications: Cardura; Cumbalta; potassium; Complex Norco; Topomax; Baclofen; Flexaril; Diovan; Klonopin; Breo inhaler; Aciphex; Lexapro; Imitrex; and Fe Infusion.[26] The claimant was diagnosed at that time with: bipolar disorder; major depressive disorder; anxiety disorder; insomnia; localization-related (focal) (partial) symptomatic epilepsy syndrome with complex partial seizures; post-traumatic stress disorder; Type 2 diabetes mellitus with other diabetic complications; multi-system degeneration of the autonomic nervous system; pain in left arm; hyperlipidemia; essential (primary) hypertension; chest pain; and migraine.[27]

On February 28, 2018, the claimant reported that she was not having a good day and had a headache. She further reported that she had been to the hospital having passed out twice and having had a seizure. Her Keppra and BP levels were low.[28]

On March 23, 2018, Dr. Uhrich reported:

The rage happens about every 4-5 days. Describes an incident with her dentist when her blood boiled. Then talked about her urge to gamble on the rexulti she was making Christmas balls by the hundreds compulsively, which changed to any type of balls (St. Patrick's, etc.) then to gambling. And has threatened her husband and her daughter to give her money to go gamble.[29]

---

[25] Tr. 162.

[26] *Id.*

[27] Tr. 163.

[28] Tr. 167.

[29] Tr. 168.

On March 8, 2019, the claimant saw Dr. Uhrich and brought her functional capacity assessment form to be filled out.  Dr. Uhrich noted the following:

> Continuing anxiety symptoms have been observed.  Symptoms have increased in frequency and intensity.  There has been a worsening of the feelings of apprehension.  There have been more frequent episodes of tachycardia, rapid breathing and sweating.  Her avoidance of certain situations has increased because they evoke anxiety.  Ms. Senegal's episodes of difficulty concentrating are occurring more frequently.  Her fear of losing control is occurring more frequently and with more intensity.  Sensations of heart symptoms are occurring more frequently.  Hypervigilance is occurring more frequently.  There is an increase in episodes of irritability.  There is an increase in her uncomfortable sensations of excessive motor tension.  There has been an increase in the motor restlessness associated with anxiety.  Sleep disturbance caused by anxiety/depression has increased.  Shortness of breath associated with anxiety has worsened.  An increased startle response [sic] is reported.  There has been an increase in her likelihood to sweat when anxious or self-conscious.  Episodes of trembling and shaking associated with anxiety have increased.  Continued depressive symptoms are reported by Ms. Senegal.  Symptoms of anhedonia have increased.  Change in appetite has worsened, with some days she has no appetite and other days she will "eat something."  She describes an increased difficulty concentrating.  She describes an increase in crying spells.  There has been an increase in Ms. Senegal's symptoms of sadness.  Sleep difficulty has worsened and has now flipped to hypersomnolence.  Social isolation has worsened.  Ms. Senegal describes more difficulty thinking.

> [ . . . ]

> She specifically denies manic symptoms.  However, she also tells me that twice, she heard voices.  Both times, it was late at night and she heard 2 people talking, but could not make out any of the words.  Her husband was asleep in the bedroom and so had not been talking to anyone.  This was about 3 weeks ago.

And patient has post concussion migraines, 4-5 times per week or 18-20 times per month. She has no aura, but the pain starts mainly in the right eye, but occasionally in the left eye. The pain will increase to the point that she is light, noise and motion sensitive and becomes nauseous. She will also throw up on some occasions.[30]

On exam, Dr. Uhrich noted:

Ms. Senegal appears calm, glum, sad looking, downcast, attentive, communicative, casually groomed, overweight, and looks unhappy. Her speech is slow, and soft. Demeanor is sad. Demeanor is glum. She appears downcast. Thought content is depressed. Body posture and attitude convey an underlying depressed mood. Slowness of physical movement helps reveal depressed mood. Speech and thinking appears slowed by depressed mood. Facial expression and general demeanor reveal depressed mood. Her affect is constricted. Associations are intact and logical. . . .[31]

In closing her report, Dr. Uhrich noted:

Ms. Senegal continues to need outpatient treatment. She continues to exhibit symptoms of an emotional disorder that adversely affects her relationships and that interfere with day to day functioning and is in need of medication management and requires continued treatment.[32]

In her Assessment, Dr. Uhrich reported that the claimant is not a malingerer and was compliant with treatment, to the best of her ability (due to memory problems). She also reported that the claimant has "marked" limitation of function in the following areas: (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and

---

[30] Tr. 172.
[31] Tr. 173.
[32] Tr. 176.

concentration for extended periods; (4) ability to make simple work-related decisions; (5) ability to respond appropriately to changes in the work setting; (6) ability to travel in unfamiliar places or use public transportation; and (7) ability to set realistic goals or make plans independently of others.[33]  She reported that the claimant has "extreme" limitation of function in the following areas: (1) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (2) ability to work in coordination with or proximity to others without being distracted by them; (3) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number of and length of rest periods; (4) ability to accept instruction and respond appropriately to criticism from supervisors; (5) ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) ability to tolerate normal levels of stress.[34]

In the Assessment, Dr. Uhrich was asked:

Do you believe that your patient can work on a regular and sustained basis in light of his or her mental impairment?

Dr. Uhrich responded "no," and when asked to explain, wrote:

[Patient] has bipolar disorder with psychosis which means her mood is never stable and she hears voices.  [Patient] also has PTSD with flashbacks.  Additionally, she has partial complex seizures and 18-20 migraine days per month.  Add to that the post-concussion syndrome

---

[33] Tr. 194-97.

[34] *Id.*

and she very rarely makes it out of the house for even the essentials, no, she lacks the capacity for employment.[35]

Dr. Uhrich's Assessment was not included in the ALJ's discussion, because it was provided after the ALJ issued her decision. However, to the extent that the Appeals Council concluded that the Assessment would not have changed the result reached by the ALJ, the undersigned finds this was in error. Dr. Uhrich's Assessment is consistent with her treatment notes, which show a history of severe mental health issues that adversely affect the claimant's memory, concentration, and ability to get along with others. Additionally, to the extent the Commissioner argues the Assessment should not be considered because Dr. Uhrich failed to note a timeframe in the report, the undersigned finds that Dr. Uhrich's treatment notes indicate the Assessment was completed on or about March 8, 2019. The claimant had been treating with Dr. Uhrich since 2018, at the time of her administrative hearing. Therefore, the undersigned concludes the Commissioner's argument as to timeframe is without merit.

This finding dovetails with the claimant's argument that the ALJ did not give proper weight to the opinion of Dr. Edgardo Concepcion, her treating psychiatrist. On November 29, 2016, Dr. Concepcion reported that the claimant had been treating with him since November 2008. He reported that she attended her scheduled

---

[35] Tr. 197.

treatment sessions and was compliant with her medication. Despite this, Dr. Concepcion reported that although the claimant was doing well with her treatments, she was "mentally unstable and incapable of working until further notice."[36] The ALJ gave this opinion "little weight," finding that this opinion related to an ultimate issue reserved to the Commissioner. The ALJ also noted that this opinion provided no functional limitations, was inconsistent with the totality of the mental health treatment evidence and appeared to be internally inconsistent.

The Social Security regulations and rulings explain how medical opinions are to be weighed.[37] The ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with. . . other substantial evidence."[38] While the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion,[39] the ALJ cannot reject a medical opinion without an explanation supported by good cause.[40] However, the ALJ has sole responsibility for determining the claimant's disability status.[41] Although a

---

[36] Tr. 548.
[37] 20 C.F.R. §§404.1527(c), 416.927(c), SSR 96-2p, SSR 96-5p.
[38] 20 C.F.R. § 404.1527(d)(2).
[39] *Martinez v. Chater*, 64 F.3d at 176.
[40] *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000) (citations omitted).
[41] *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[42]  In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[43]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[44]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[45]

Here, the ALJ gave little weight to the opinion of Dr. Concepcion on grounds it was inconsistent with other treatment evidence in the record.   However, the undersigned finds that Dr. Concepcion's opinion was *not* inconsistent with other mental health treatment evidence, and points to Dr. Uhrichs's treatment notes in support of this finding.  The treatment notes of Dr. Uhrich and the opinion of Dr.

---

[42] *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), *citing Newton v. Apfel*, 209 F.3d at 455.

[43] 20 C.F.R. ' 404.1527(c)(2). See, also, *Loza v. Apfel*, 219 F.3d at 393.

[44] *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-44 (5th Cir. 2009).

[45] *Id.*

Concepcion are, largely, consistent, with both finding that the claimant is not a candidate for work.

The undersigned is cognizant that the ultimate determination of disability is reserved to the Commissioner, and, in the absence of functional limitations, the ALJ properly discounted Dr. Concepcion's opinion. However, as the undersigned is recommending remand to further consider the Assessment of Dr. Uhrich, the undersigned urges the ALJ on remand to consider both the treatment records and opinions of Dr. Concepcion, as well as the Assessment of Dr. Uhrich.

Moreover, in light of the treatment notes of two of the claimant's treating physicians – Dr. Concepcion and Dr. Uhrich – the undersigned has questions concerning whether the claimant satisfies or medically equals a listed impairment. Because the ALJ was not able to independently consider the Mental Residual Functional Capacity Assessment completed by Dr. Uhrich, the undersigned recommends that, upon remand, the ALJ should reconsider whether, in light of the Assessment and the other treatment notes of Drs. Concpecion and Uhrich, the claimant satisfies a listing.

### Side effects of medication

The claimant argues that the ALJ erred in failing to consider the side effects of her medications, which include: Cardura; Cumbalta; potassium; B Complex;

Norco; Topomax; Baclofen; Flexaril; Diovan; Klonopin; Breo inhaler; Aciphex; Lexapro; Imitrex; Fe Infusion; and Trexall.

At her administrative hearing, the claimant reported side effects from her medications, testifying that the medication "leaves her worse," "zaps" her, and makes her feel like she's climbing a hill every day."[46]  However, the Commissioner argues that the record contains several notations wherein the claimant reported that she did not have side effects from her medications.[47]  The Commissioner further argues that the claimant fails to point to evidence in the record supporting her claim that she has side effects from her medication.

Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [ ] pain or other symptoms."[18]  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999).

The undersigned notes that at least one treatment record discusses the side effects of the claimant's medications.  On February 1, 2018, Dr. Uhrich reported that the claimant was experiencing side effects.[48]  Given the number of medications that the claimant takes, and further considering her testimony that she has adverse side

---

[46] Tr. 328.
[47] Tr. 248, 619, 621, 623, 625, 627, 629, 798, 982.
[48] Tr. 162.

effects from those medications, the undersigned concludes that the ALJ erred in failing to consider the dosages and side effects of those medications in her decision.

### Questioning the VE (Step 5 error)

The claimant argues that the ALJ erred by not allowing her to question the VE at her administrative hearing. The record shows that when the ALJ was posing hypothetical questions to the VE, the claimant appeared to interject, correcting the ALJ about her impairments.[49] The ALJ informed the claimant that he was asking questions about a hypothetical claimant, and not the claimant herself.

The transcript of the hearing shows that the ALJ posed a proper hypothetical question to the VE, who responded that such person could perform the jobs of price marker, fitting room attendant, and housekeeper, each of which exists in significant numbers in the national economy.[50] The record shows that the ALJ asked the claimant to not interrupt the VE while he provided his testimony,[51] but that after the VE answered the ALJ's hypothetical questions, the ALJ then asked the claimant if there is "anything else that we need to address before we close out?"[52] The Commissioner argues that the claimant therefore had the opportunity to question the VE with her own hypothetical questions and her failure to do so cannot be adjudged

---

[49] Tr. 330.
[50] Tr. 289-290, 329-331.
[51] Tr. 330.
[52] Tr. 331.

an error now.  *See, e.g., Barlow v. Berryhill*, 700 F.Appx. 375, 376 (5th Cir. 2017) (curtailing a particular line of questioning the ALJ deemed cumulative or immaterial is not reversible error).

In *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir.), the Fifth Circuit reasoned that if the ALJ's hypothetical omits a recognized limitation "and the claimant or his representative is afforded the opportunity to correct deficiencies in the [ALJ's] question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the administrative law judge's findings and disabilities recognized but omitted from the question)," there is no reversible error.  *Wise v. Barnhart*, 101 Fed. App'x. 950, 951 (5th Cir. 2004) (*per curiam*), *quoting Bowling*, 36 F.3d at 436.  The Commissioner argues that the claimant should not now be heard to complain of the adequacy of the ALJ's hypothetical questions to the VE when any alleged ambiguities therein were not deemed sufficient to merit adversarial development in the administrative hearing.  *See Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000).

While the record shows that the VE responded to the hypothetical questions that contained all limitations recognized by the ALJ, the undersigned questions whether those responses support the ALJ's finding of non-disability.  One exchange follows:

> ALJ:  Mr. Rue, same hypo with an additional limitation.  Let's say this hypothetical individual will be off task at least 15 percent of the

workday.  That could be due to severe impairments, medication side effects, or the need for additional breaks above and beyond what's normal and customary in the national economy.  For whatever reason, off task at least 5 percent of the workday.  Can that hypothetical individual perform any work?

VE: No, Your Honor.  That person could not maintain employment in the national economy.[53]

Furthermore, it is unclear to the court whether the claimant understood her right to question the VE at her hearing, as she had been admonished for speaking during the ALJ's questioning of the VE and was not specifically asked by the ALJ whether she wished to pose her own hypothetical questions.  Given that the ALJ did not consider Dr. Uhrich's March 2019 Assessment, and that the undersigned is recommending remand for further consideration of that Assessment, the undersigned recommends that the ALJ conduct a new hearing, with a VE, to address whether there are jobs in the national economy for a hypothetical claimant with limitations similar to the claimant's.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned finds that the ALJ's findings are not based on substantial evidence in the record.  Accordingly, **IT IS RECOMMENDED that** this matter be REMANDED to the ALJ for further

---

[53] Tr. 330.

consideration in light of the new evidence not previously considered and in accordance with the directives contained herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

THUS DONE in Chambers on this 19th day of August, 2021.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**